IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BRUCE & TANYA & ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17-cv-01155 (LMB/TCB) |
| | ) | |
| BOARD OF SUPERVISORS OF | ) | |
| FAIRFAX COUNTY, VIRGINIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Bruce & Tanya & Associates, Inc. ("BTA" or "plaintiff") has filed a complaint alleging

that Virginia's statutory scheme governing signs placed "within the limits of" highways—on its

face and as enforced by Fairfax County ("County"), the County's Board of Supervisors

("Board") (collectively, the "County Defendants"), and Virginia's Commissioner of Highways

("Commissioner")—violates the First and Fourteenth Amendments to the U.S. Constitution.

Before the Court are the County Defendants' motion to dismiss [Dkt. No. 49], the

Commissioner's motion to dismiss [Dkt. No. 52], and BTA's motion for summary judgment and

injunctive relief [Dkt. No. 55]. The Court has heard oral argument and received supplemental

briefing. For the reasons stated below, defendants' motions to dismiss will be granted, BTA's

motion will be denied, and judgment will be entered in favor of defendants.

I. BACKGROUND

**A. Factual Background**

BTA is a real estate company operating across Burke, Springfield, and Fairfax Station,

Virginia. Pl.'s Br. in Supp. of Its Mot. for Partial Summ. J. and for a Prelim. Inj. [Dkt. No. 56]

("BTA's SJ Br.") 4; id. Ex. A [Dkt. No. 56-1] ("Tyburski Decl.") ¶¶ 2-3. "[A]s a service to

BTA's clients," BTA often posts real estate sales signs immediately adjacent to highways. Am.

Compl. [Dkt. No. 46] ¶¶ 9-10; Pl.'s Reply in Supp. of Its Mot. for Partial Summ. J. [Dkt. No. 65] 2. For most of BTA's 30-year history, its posting of real estate sales signs met with little resistance. Although the Virginia Department of Transportation ("VDOT")[1] would remove signs "once or twice a year," BTA never received any fines. Tyburski Decl. ¶¶ 4-5.

Beginning in April 2012, VDOT notified BTA that its signs were violating section 33.2-1224 of the Virginia Code, which prohibits posting signs or advertisements "within the limits of any highway." BTA's SJ Br. 4. VDOT's enforcement efforts were soon joined by those of the Board, which in March 2013 signed a cooperative agreement with the Commissioner to enforce section 33.2-1224.[2] Tyburski Decl. ¶ 13; see Am. Compl. Ex. B [Dkt. No. 46-2] ("Enforcement Agreement"). VDOT and the Board enjoy concurrent authority: VDOT is responsible for all roads in the County, see Commissioner of Highway's Memo. in Opp'n to Pl.'s Mot. for Summ. J. [Dkt. No. 63] ("Comm'r's SJ Opp'n") 2-3, and the Board enforces section 33.2-1224 on designated roads in Fairfax County through its Illegal Sign Removal Program, BTA's SJ Br. 5; id. Ex. C [Dkt. No. 56-3].

In the first three years of the Illegal Sign Removal Program, the County collected signs believed to be in violation of the statute but issued no fines. Memo. in Supp. of Defs. Board of Supervisors and Fairfax County's Mot. to Dismiss Am. Compl. [Dkt. No. 50] ("Cty. Defs.' MTD Memo.") 2; BTA's SJ Br. 5. The enforcement strategy changed when the Department of Code

---

[1] The Virginia Code charges the Commissioner with enforcing the sign statutes but permits the Commissioner to "assign to division engineers and other employees in [VDOT] such duties other than discretionary powers as he may deem appropriate." Va. Code Ann. § 33.2-1201.

[2] The Commissioner may "enter into agreements with the local governing body of Fairfax County authorizing local law-enforcement agencies or other local governmental entities to act as agents of the Commissioner" in order to "(i) enforc[e] the provisions of § 33.2-1224 and (ii) collect[] the civil penalties and costs provided for in that section." Va. Code Ann. § 33.2-1225(A).

Compliance ("DCC") began assisting with enforcement efforts.[3] From March to October 2016, the Board fined BTA at least 89 times. BTA's SJ Br. 5. BTA, considered to be an "egregious violator[]" of section 33.2-1224, see Cty. Defs.' MTD Memo. 2, accounted for a sizable portion of the Board's efforts. For example, from May until October 2016, approximately 21% of all fines issued by the Board went to BTA. BTA's SJ Br. 5; id. Ex. F [Dkt. No. 56-6].

In December 2016, the Board sued BTA in Fairfax County Circuit Court for payment of outstanding fines and to enjoin BTA from placing more signs along County highways.[4] BTA's SJ Br. 5. BTA filed a counterclaim in the state court proceeding, raising First and Fourteenth Amendment claims against the Board under 42 U.S.C. § 1983. It also attempted to add the Commissioner through a third-party complaint but was unsuccessful. Memo. in Supp. of Defs.' Mot. to Dismiss [Dkt. No. 53] ("Comm'r's MTD Memo.") 2. BTA took a nonsuit on its counterclaim before trial in September 2017.[5] Id. After BTA initiated this civil action, the parties agreed to ask the state court to stay that proceeding, and that request was granted. See Pl.'s Consolidated Opp'n to the Defs.' Mots. to Dismiss [Dkt. No. 25] 7-8.

---

[3] DCC staff patrol Board-designated roads on Tuesdays, Wednesdays, and Thursdays. County Defs.' Opp'n to Bruce & Tanya & Associates, Inc.'s Mot. for a Partial Summ. J. and for a Prelim. Inj. [Dkt. No. 64] ("Cty. Defs.' SJ Opp'n") ¶¶ 4, 7. DCC staff identify signs they believe to be within the limits of the highway and record the sign's image and geographic coordinates. Id. ¶¶ 8-10. If, after a comparison with property maps, the DCC staff conclude that a sign is within the limits of the highway, they issue a citation to the sign's owner. Id. ¶¶ 11-12.

[4] The Commissioner "may seek to enjoin any recurring violator," Va. Code Ann. § 33.2-1224, and the Board was authorized "to act as the Commissioner's agent" in enforcing section § 33.2-1224, see Enforcement Agreement art. 1.

[5] Virginia law permits a party to take one nonsuit as a matter of right, provided it does so before a motion to strike the evidence is sustained or before the case is submitted to the jury or the court for decision. Va. Code Ann. § 8.01-380(A)-(B).

## B. Statutory Scheme

Virginia has long regulated signs near highways "to promote the safety, convenience and enjoyment of travel . . . , to attract tourists and promote the prosperity, economic well-being and general welfare of the State, and to preserve and enhance the natural scenic beauty or aesthetic features of the highways and adjacent areas." Act of Apr. 1, 1970, ch. 322, § 33.1-351, 1970 Va. Acts 459, 555 (codified as amended at Va. Code Ann. § 33.2-1200(A)). Chapter 12, Article 1 of Title 33.2 of the Virginia Code ("Article 1") governs "the erection and maintenance of outdoor advertising in areas adjacent to the rights-of-way of the highways within the Commonwealth." Va. Code Ann. § 33.2-1200(A). Most of Article 1 addresses signs "visible from" highways. See, e.g., id. § 33.2-1205 (establishing a licensing system for advertisements "visible from the main traveled way" of any highway); id. § 33.2-1208 (establishing a similar permitting system). One provision of Article 1 is narrower: Section 33.2-1224 ("Highway Signs Statute") generally prohibits placing any signs "within the limits of" a highway:

> Any person who in any manner (i) paints, prints, places, puts, or affixes any sign or advertisement upon or to any rock, stone, tree, fence, stump, pole, mile-board, milestone, danger-sign, guide-sign, guidepost, highway sign, historical marker, building, or other object lawfully within the limits of any highway or (ii) erects, paints, prints, places, puts, or affixes any sign or advertisement within the limits of any highway is subject to a civil penalty . . . . Signs or advertisements placed within the limits of the highway are hereby declared a public and private nuisance and may be forthwith removed, obliterated, or abated by the Commissioner of Highways or his representatives without notice. . . . In addition, the Commissioner of Highways or his representative may seek to enjoin any recurring violator of this section. The Commissioner of Highways may enter into agreements with any local governing body authorizing local law-enforcement agencies or other local governmental entities to act as agents of the Commissioner of Highways for the purpose of (i) enforcing the provisions of this section and (ii) collecting the penalties and costs provided for in this section. . . .

Va. Code Ann. § 33.2-1224.

At issue in this litigation is the interaction between the Highway Signs Statute and section 33.2-1204 ("Exceptions Statute"). The Exceptions Statute exempts certain categories of

signs from some of the provisions in Article 1. The exempt signs range from those "relating

solely to farm produce, merchandise, service, or entertainment" to those "warning the public

against hunting, fishing, or trespassing" to those "advertising only the name, time, and place of

bona fide agricultural, county, district, or state fairs." Va. Code Ann. § 33.2-1204(2), (14), (17).

In April 2018, the Virginia General Assembly amended the Exceptions Statute. See Act

of Apr. 6, 2018, 2018 Va. Laws ch. 794. The amendment changed the statute in two ways. It first

made explicit that the types of signs described in the Exceptions Statute were not exempt from

the broad prohibition in the Highway Signs Statute unless specifically noted. It then identified

six types of signs that are exempt from the Highway Signs Statute (identified as "§ 33.2-1224").

As amended, the Exceptions Statute provides:

> The following signs and advertisements, if securely attached to real property or
> advertising structures, and the advertising structures or parts thereof upon which
> they are posted or displayed are excepted from all the provisions of [Article 1]
> except those enumerated in . . . [§] 33.2-1224 . . . :
>
> . . .
>
> 5. Notwithstanding the provisions of § 33.2-1224, danger or precautionary signs
> relating to the premises or signs warning of the condition of or dangers of travel
> on a highway erected or authorized by the Commissioner of Highways; forest fire
> warning signs erected under authority of the State Forester; and signs, notices, or
> symbols erected by the United States government under the direction of the U.S.
> Forest Service;
>
> 6. Notwithstanding the provisions of § 33.2-1224, notices of any telephone
> company, telegraph company, railroad, bridges, ferries, or other transportation
> company necessary in the discretion of the Commissioner of Highways for the
> safety of the public or for the direction of the public to such utility or to any place
> to be reached by it;
>
> . . .
>
> 12. Notwithstanding the provisions of § 33.2-1224, historical markers erected by
> duly constituted and authorized public authorities;
>
> 13. Notwithstanding the provisions of § 33.2-1224, highway markers and signs
> erected or caused to be erected by the Commissioner of Highways or the Board or
> other authorities in accordance with law;

. . .

15. Notwithstanding the provisions of § 33.2-1224, signs erected by Red Cross authorities relating to Red Cross Emergency Stations, with authority hereby expressly given for the erection and maintenance of such signs upon the right-of-way of all highways in the Commonwealth at such locations as may be approved by the Commissioner of Highways;

. . .

19. Notwithstanding the provisions of § 33.2-1224, signs containing advertisements or notices that have been authorized by a county and that are securely affixed to a public transit passenger shelter that is owned by that county, provided that no advertisement shall be placed within the right-of-way of the Interstate System, National Highway System, or federal-aid primary system of highways in violation of federal law. . . .

Va. Code Ann. § 33.2-1204.

## C. Procedural History

BTA filed its initial complaint in October 2017 and filed an Amended Complaint on February 9, 2018 [Dkt. No. 46]. The Amended Complaint alleges multiple violations of BTA's constitutional rights, including that the Commonwealth's statutory scheme for regulating signs near highways violates the First Amendment, is unconstitutionally vague, and has been selectively enforced against BTA. Count I of the Amended Complaint seeks declaratory relief; Count II seeks damages, injunctive relief, attorney's fees, and costs under 42 U.S.C. §§ 1983 and 1988.

Both the County Defendants and the Commissioner have moved to dismiss the Amended Complaint, and BTA has moved for partial summary judgment and for preliminary or permanent injunctive relief. The Court heard oral argument on the parties' motions and required supplemental briefing on the effect of the April 2018 amendment to the Exceptions Statute in October 2018. That briefing has been provided.

## II. ANALYSIS

### A. **Standards of Review**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, an action must be dismissed if the court lacks subject matter jurisdiction. The plaintiff, as the party asserting jurisdiction, bears the ultimate burden of proving such jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). If "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based[,] . . . all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Id. But in the event of a factual dispute over the jurisdictional allegations in the complaint, the court may consider evidence outside the complaint "without converting the proceeding to one for summary judgment." Id.

A complaint should be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 570). The Court must "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor," Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002), but only to the extent those allegations pertain to facts rather than legal conclusions. See Iqbal, 556 U.S. at 678-79.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it "might affect the outcome of the suit under the governing law," Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (citation omitted), and a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the evidence, and the inferences drawn therefrom, must be viewed in the light most favorable to the nonmovant, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

A preliminary injunction "is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To be entitled to such a remedy, plaintiff must show that it is likely to succeed on the merits, that it will likely suffer irreparable harm absent an injunction, that the balance of hardships weighs in its favor, and that an injunction is in the public interest. League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). Although plaintiff must "make a 'clear showing' that [it is] likely to succeed at trial, . . . [it] need not show a certainty of success." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) (citation omitted). And even if this showing is made, "whether to grant the injunction still remains in the 'equitable discretion' of the court." Christopher Phelps & Assoc., LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007). A similar standard governs permanent injunctions, for which the movant must show (i) "that it has suffered an irreparable injury"; (ii) "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (iii) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (iv) "that the public interest would not be disserved by a

permanent injunction." Boston Correll v. Herring, 212 F. Supp. 3d 584, 615 (E.D. Va. 2016) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

The heart of this action is BTA's claim that the Highway Signs Statute and Exceptions Statute (collectively, the "Sign Statutes") violate its First Amendment right to free speech. Before the Court can reach that claim, it must first resolve several antecedent issues raised by defendants in their motions to dismiss.

### B. State Sovereign Immunity

The Commissioner first moves for dismissal of this action based on a claim of state sovereign immunity. Generally, absent a state's waiver or a valid abrogation by Congress, "federal courts may not entertain a private person's suit against a State." Id. at 253-54. This immunity covers not only the state itself but also "arm[s] of the State." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977). Moreover, because a state official sued in his official capacity stands in for the entity he represents, he is equally entitled to assert that entity's sovereign immunity from suit. See Kentucky v. Graham, 473 U.S. 159, 167 (1985).

State sovereign immunity is not absolute. As relevant here, the doctrine recognized in Ex parte Young, 209 U.S. 123 (1908), provides that "private citizens may sue state officials in their official capacities in federal court to obtain prospective relief from ongoing violations of federal law." Allen v. Cooper, 895 F.3d 337, 354 (4th Cir. 2018). When a state official is sued solely for prospective relief in an official capacity, he "loses 'the cloak' of State immunity." Id. (quoting Bragg v. W. Va. Coal Ass'n, 248 F. 3d 275, 292 (4th Cir. 2001)). Regardless of how a claim is styled, courts must ask whether the claim seeks prospective relief that will "govern[] the official's future conduct" or instead seeks "retroactive monetary relief." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-03 (1984); see Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (describing the inquiry as whether a plaintiff's complaint

"alleges an ongoing violation of federal law and seeks relief properly characterized as prospective" (citation omitted)).

BTA has conceded that it is not seeking any monetary relief, retroactive or otherwise, from the Commissioner. Pl.'s Opp'n to Commissioner of Highway's Mot. to Dismiss [Dkt. No. 59] ("BTA's Opp'n to Comm'r's MTD") 5 n.2. Instead, "[i]t seeks to have this Court declare that the Sign Statutes are unconstitutional and to enjoin the Commissioner . . . from violating federal constitutional law." Id. at 6. What BTA wants, in essence, is to change how the Commissioner enforces the Sign Statutes going forward. This is the essence of an Ex parte Young action. Accordingly, the Commissioner's immunity argument fails.

### C. Liability Under § 1983

#### 1. The County Defendants

The County Defendants first move to dismiss on the ground that they are not subject to suit under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978). This argument also fails. Section 1983 imposes liability on any "person" who under color of law deprives another of the rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. Local governmental entities, including counties, "qualify as 'persons' under the statute, rendering them amenable to suit." Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 402 (4th Cir. 2014); see Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Although municipalities do not enjoy the qualified immunity granted to local officials, they may only be held liable for their own acts; there is no respondeat superior liability for actions of local employees. Owens, 767 F.3d at 402. Accordingly, "a municipality is only liable under section 1983 if it causes . . . a deprivation through an official policy or custom." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999).

The County Defendants do not deny that BTA has "identif[ied] the offending . . . policy with precision" or that it has affirmatively linked an allegedly unconstitutional deprivation to that policy, see Carter, 164 F.3d at 218-19. Instead, the County Defendants argue that because the Sign Statutes were enacted by the state, they cannot be subject to a § 1983 action based on constitutional defects those statutes may contain. Cty. Defs.' MTD Memo. 7-8. In support, they cite several cases for the general proposition that "a locality cannot be subject to § 1983 liability for enforcing the laws of the Commonwealth." Id. at 8 (citing, among others, Bockes v. Fields, 999 F.2d 788, 791 (4th Cir. 1993)).

This argument does not withstand scrutiny. Whatever may be said of that proposition,[6] this is not a case in which a local official simply passively applied a state policy. Cf. Bockes, 999 F.2d at 791 (holding that a county social services board could not be held liable under Monell for firing the plaintiff according to the state's personnel policies and emphasizing that state law assigns all responsibility for setting personnel policies to the state board). Here, the County Defendants opted to enter into the Enforcement Agreement with the Commissioner, and

---

[6] The extent to which local governments are immune from § 1983 suits when they apply or enforce state law is something of an open question. Compare, e.g., Bethesda Lutheran Homes & Servs., Inc. v. Leean, 154 F.3d 716, 718 (7th Cir. 1998) ("[W]hile a county does not have the shield of the Eleventh Amendment, it cannot be held liable under section 1983 for acts that it did under the command of state or federal law."), with, e.g., Evers v. Custer County, 745 F.2d 1196, 1203-04 (9th Cir. 1984) (concluding that a county could be sued under § 1983 for declaring a road to be public even though it had done so according to a state statute assigning county commissioners that responsibility), and Davis v. City of Camden, 657 F. Supp. 396, 404 (D.N.J. 1987) ("[T]he fact that state law mandates that a municipality implement a particular policy does not render the municipality's affirmative adoption of that policy any less of a municipal policy than when state law merely authorizes the municipality's action, or when state law is silent."). As other district courts have observed, there is "somewhat surprisingly . . . little authority" on this question, Davis, 657 F. Supp. at 402, and federal courts have taken a variety of approaches, see N.N. ex rel. S.S. v. Madison Metro. Sch. Dist., 670 F. Supp. 2d 927, 932-37 (W.D. Wis. 2009). In general, the prevailing view is that a local government's exposure to Monell liability for enforcing state law turns on the degree of discretion the local government retains and whether the locality has made its own deliberate choices with respect to the law.

in so doing they voluntarily took ownership over enforcing the Highway Signs Statute. "Monell is a case about responsibility," Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986), and here there is no doubt that the County has sufficient discretion and has acted independently enough "to make [it] 'responsible' for any constitutional violation that occurred," N.N. ex rel. S.S. v. Madison Metro. Sch. Dist., 670 F. Supp. 2d 927, 936 (W.D. Wis. 2009). In sum, the County Defendants cannot categorically immunize themselves from § 1983 liability stemming from the statutory scheme they voluntarily agreed to enforce.

### 2. The Commissioner

The Commissioner also moves to dismiss by arguing that he is not properly subject to suit under § 1983. "A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity." King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016). An official is personally liable if the plaintiff shows that the official caused the deprivation of a federal right under color of state law. Id. An official-capacity suit, on the other hand, is treated as a suit against the governmental entity, with liability only where "the entity itself is a 'moving force' behind the deprivation." Graham, 473 U.S. at 166 (internal quotation marks and citation omitted). Finally, supervisory liability exists only where the supervisor "knew that his subordinate 'was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury'" and showed "deliberate indifference to or tacit authorization of the alleged offensive practices," and where there was "an 'affirmative causal link'" between the supervisor's inaction and the injury. King, 825 F.3d at 224 (citation omitted).

BTA has not successfully stated a § 1983 claim against the Commissioner. BTA makes no attempt to hold the Commissioner liable in his personal capacity. Instead, BTA argues that because the Commissioner "delegate[d]" his statutory enforcement power to the Board via the

Enforcement Agreement, "the actions taken by the Board and [the] County, as agents of the Commissioner . . . , are attributable to him." BTA's Opp'n to Comm'r's MTD 6-7.

BTA misconstrues the law. By basing its theory of liability on agency principles, BTA ignores what the Supreme Court and this circuit have stated time and again: There is no vicarious liability in § 1983 claims. See, e.g., Iqbal, 556 U.S. at 675; Monell, 436 U.S. at 691; Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985). To sustain a § 1983 claim against the Commissioner, BTA must show that the Commissioner himself has acted in a way that caused BTA a cognizable injury. Simply signing an agreement authorizing another body to enforce a statute is not enough.

Nor can BTA claim that the Commissioner is liable in a supervisory capacity. The Commonwealth and the County operate as coequal enforcers of the Sign Statutes, not as supervisor and supervisee. Even if the Commissioner were deemed the County Defendants' supervisor, BTA has failed to plead facts indicating the Commissioner knew that the County Defendants' actions posed a "pervasive and unreasonable risk of constitutional injury" or that the Commissioner's failure to act bore a causal relationship to the injuries BTA allegedly suffered. Pleading supervisory liability under § 1983 is difficult; BTA has failed to meet its burden.

Accordingly, the Court will grant the Commissioner's motion to dismiss as to BTA's § 1983 claims against the Commissioner.

### D. Justiciability

Finally, defendants mount several defenses to BTA's suit based on justiciability principles. None is convincing.

#### 1. Declaratory Judgment Action

Defendants first address the availability of declaratory relief. The County Defendants argue that BTA may not seek a declaratory judgment against them as to the Exceptions Statute because they "do not administer or enforce" that statute and therefore have no interests adverse to BTA's.

Cty. Defs.' MTD Memo. 4-5. The Commissioner argues that there is no live controversy between

it and BTA because "VDOT has not cited [BTA] for any violations since 2013."[7]

Declaratory relief is available only in cases "of actual controversy," 28 U.S.C. § 2201(a),

which the Supreme Court has construed to mean justiciable controversies under Article III of the

Constitution. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239-40 (1937).

To satisfy the case-or-controversy requirement, a declaratory action must stem from a dispute

that is "definite and concrete, touching the legal relations of parties having adverse legal

interests," and must be "real and substantial" and "of a conclusive character." MedImmune,

Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (citation omitted).

An actual controversy exists between BTA and the County Defendants. The County

Defendants have fined and sought to enjoin BTA for violating the Highway Signs Statute. BTA

claims that it was unconstitutional for them to have done so because the Highway Signs Statute,

together with the Exceptions Statute, is facially unconstitutional. That puts BTA and the County

---

[7] The Commissioner advances two additional arguments. First, he argues that BTA must first seek relief under section 33.2-1229 of the Virginia Code, which provides that "[a]ny person aggrieved by the action of the Commissioner . . . in enforcing" Article 1 "may appeal the decision of the Commissioner . . . in accordance with the Administrative Process Act." Va. Code Ann. § 33.2-1229(B). Although a declaratory action may not be used to "preempt and prejudice issues that are committed for initial decision to an administrative body," Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc., 344 U.S. 237, 246 (1952), here the issue is whether plaintiff may be subject to fines under the Sign Statutes in the first place, and thus "the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right." Pub. Utils. Comm'n v. United States, 355 U.S. 534, 539-40 (1958). As it is uncertain whether the section 33.2-1229 process was intended for or is capable of handling claims of this kind, the Court declines to impose such an exhaustion requirement in this case.

The Commissioner also argues that the Court should decline to consider BTA's request for declaratory relief. District courts have discretion over whether to hear a declaratory judgment action based on "the usefulness of the declaratory judgment remedy . . . and the fitness of the case for resolution," Wilton v. Seven Falls Co., 515 U.S. 277, 289 (1995); however, the Court finds no good reason to decline to adjudicate BTA's declaratory judgment claim, particularly given the state court's decision to stay the proceeding before it.

Defendants squarely at odds over a cognizable injury, and adjudicating the request for declaratory relief would be neither premature nor unwise.

The same conclusion applies to the dispute between BTA and the Commissioner. The Commissioner is responsible for enforcing the Sign Statutes; BTA is a frequent violator of the Highway Signs Statute; the state has enforced the provision against BTA in the past; and although the Commissioner has not cited BTA in a number of years, that does not make the dispute so hypothetical that it does not satisfy the case-or-controversy requirement. Moreover, adjudicating BTA's request for declaratory relief will "serve a useful purpose in clarifying the legal relations in issue," White v. Nat'l Union Fire Ins. Co., 913 F.2d 165, 168 (4th Cir. 1990) (citation omitted), and the dispute between the parties is sufficiently concrete to lend itself to a judicial declaration.

2. Standing

Next, the County Defendants argue that they cannot redress any injury that the Exceptions Statute causes BTA, and therefore BTA lacks standing to challenge the Exceptions Statute against them. This argument is equally meritless.

To have standing, a plaintiff must show that (i) it suffered an actual or imminent injury in fact that is both concrete and particularized, (ii) the injury is fairly traceable to the defendant's conduct, and (iii) the injury will be redressed by a favorable judicial determination. Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 396 (4th Cir. 2011). All three elements are met here. The County Defendants' argument to the contrary rests on the idea that "the County Defendants cannot ameliorate any injury allegedly caused" by the Exceptions Statute. Cty. Defs.' MTD Memo. 7. That argument is not valid because if the Court were to determine that the Highway Signs Statute and the Exceptions Statute together were facially

unconstitutional, and consequently that they could not be enforced against BTA, the resulting judgment would redress BTA's injuries. BTA clearly has standing to seek this relief.

**E. First Amendment**

Both counts of the Amended Complaint allege that the Sign Statutes violate BTA's First Amendment right to free speech because they form a content-based restriction on speech that is not narrowly tailored to serve a compelling governmental interest. Defendants disagree, arguing that the bulk of the exceptions in the Exceptions Statute do not apply to the Highway Signs Statute and that therefore the Highway Signs Statute is content neutral. After the April 2018 amendment to the Exceptions Statute, which altered how the two statutes interact, the parties were invited to file supplemental briefing addressing the effect, if any, of the April 2018 amendment on BTA's First Amendment claim [Dkt. No. 122], and all of the parties did so [Dkt. Nos. 125, 126, and 127]. The Court will first address BTA's request for prospective relief in light of that amendment before turning to consider whether BTA is entitled to any damages for pre-amendment enforcement of the Sign Statutes.

1. Prospective Relief

BTA relies on Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015), in arguing that strict scrutiny should be applied in assessing whether the Sign Statutes violate the First Amendment. Reed involved a municipal sign code that generally prohibited outdoor signs but exempted 23 categories of signs from that prohibition. Id. at 2224. The Reed Court focused on three of the exempt categories: ideological signs, those "communicating a message or ideas for noncommercial purposes," which were treated favorably; political signs, defined as temporary signs "designed to influence the outcome of an election," which were treated less favorably; and temporary directional signs relating to a qualifying event such as an "assembly, gathering, activity, or meeting," which were the most heavily restricted. Id. at 2224-25. A church that relied

on temporary signs to direct members of the public to its services challenged the sign code under the First Amendment. Id. at 2225-26. The district court granted summary judgment in favor of the town, and the court of appeals affirmed, holding that the sign statute was "properly considered content neutral" and "reasonable in relation to its purpose." See Reed v. Town of Gilbert, 707 F.3d 1057, 1064-65, 1071-72 (9th Cir. 2013).

The Supreme Court reversed, explaining that content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed, 135 S. Ct. at 2227. The Court elaborated that a law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed"—that is, if the law "draws distinctions based on the message a speaker conveys." Id. The Court concluded that the sign code at issue was content based, given that the restrictions applicable to a particular sign "depend[ed] entirely on the communicative content of the sign." Id. The Court rejected several theories to the contrary, holding that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech," id. at 2228 (quoting Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993)), and that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter," id. at 2229-30.

Having concluded that the sign code was content based, the Court proceeded to apply strict scrutiny. The town had advanced two interests protected by the code: aesthetic appeal and traffic safety. Reed, 135 S. Ct. at 2231. The Court assumed arguendo that these were compelling interests but struck down the sign code as not narrowly tailored, explaining that "temporary directional signs are 'no greater an eyesore' than ideological or political ones" and that the town

"offered no reason to believe that directional signs pose a greater threat to safety than do ideological or political signs." Id. at 2231-32.

The Reed Court emphasized that although content-based laws must pass strict scrutiny, "[l]aws that are content neutral are . . . subject to lesser scrutiny." 135 S. Ct. at 2232. According to the majority, the town's content-neutral alternatives were "ample" and included regulating the "size, building materials, lighting, moving parts, and portability" of signs and banning signs on public property "in an evenhanded, content-neutral manner." Id. Justice Alito's concurrence also provided a list of non-content-based rules. Id. at 2233-34 (Alito, J., concurring). That list included laws regulating the size, location, physical characteristics, and frequency of signs, and it added that "government entities may also erect their own signs consistent with the principles that allow governmental speech," including signs "to promote safety, as well as directional signs and signs pointing out historic sites and scenic spots." Id. at 2233 (citing Pleasant Grove City v. Summum, 555 U.S. 460, 467-69 (2009)).

Before the April 2018 amendment, BTA's argument was straightforward: All of the exceptions in the Exceptions Statute apply to the Highway Signs Statute. Many of those are content based. Because the Highway Signs Statute and Exceptions Statute together form a content-based regulation of speech, the Court must assess the scheme under strict scrutiny. And the Sign Statutes fail strict scrutiny either because defendants' asserted interests are insufficiently compelling or because the regulations are not narrowly tailored to advance those interests.

The April 2018 amendment substantially weakened BTA's argument. The parties agree that after the amendment, only six exceptions apply to the Highway Signs Statute. See Commissioner of Highways' Memo. [Dkt. No. 125] 4-6; Pl.'s Br. Concerning the Effect of the Amendment of Va. Code § 33.2-1204 [Dkt. No. 126] 3-4. The problem for BTA is that none of

the six is "content based" in the sense that concerned the <u>Reed</u> Court. Five of the exceptions relate exclusively to government speech; the sixth is a time, place, and manner restriction.

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." <u>Summum</u>, 555 U.S. at 467. As the Supreme Court has explained, "'it is not easy to imagine how the government could function' if it were subject to the restrictions that the First Amendment imposes on private speech." <u>Matal v. Tam</u>, 137 S. Ct. 1744, 1757 (2017) (quoting <u>Summum</u>, 555 U.S. at 468). The government may speak for itself and may be selective about the views it wishes to express, <u>Summum</u>, 555 U.S. at 467-68, and "may selectively aid certain kinds of private speech and thereby 'regulate the content of what is or is not expressed'" by enlisting private entities to convey the government's message or using government funds, <u>Columbia Union Coll. v. Clarke</u>, 159 F.3d 151, 156 (4th Cir. 1998) (quoting <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 833 (1995)).

No bright line differentiates "when the government is 'speaking' and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so." <u>Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of the Va. Dep't of Motor Vehicles</u>, 288 F.3d 610, 618 (4th Cir. 2002). Instead, courts consider factors including (i) the central purpose of the program or context in which the speech occurs, (ii) the degree of editorial control the government exercises over the content, (iii) the identity of the literal speaker, and (iv) whether the government or the private entity bears the ultimate responsibility for the content of the speech. <u>Id.</u> at 618-19; <u>see</u> <u>Wells v. City & County of Denver</u>, 257 F.3d 1132, 1141 (10th Cir. 2001); <u>see also</u> <u>Page v. Lexington Cty. Sch. Dist. One</u>, 531 F.3d 275, 281 (4th Cir. 2008) (distilling these factors into a two-part inquiry "focusing on (1) the government's <u>establishment</u> of the message, and (2) its <u>effective control</u> over the content and dissemination of the message").

Under the 2018 amendment, five of the exceptions pertain only to government speech.

First, subsection (5) exempts

> danger or precautionary signs relating to the premises or signs warning of the condition of or dangers of travel on a highway erected or authorized by the Commissioner . . . ; forest fire warning signs erected under authority of the State Forester; and signs, notices, or symbols erected by the United States government under the direction of the U.S. Forest Service.

Va. Code Ann. § 33.2-1204(5). This exception serves the traditional governmental purpose of warning citizens of dangers on the roadway. Subsection (6) exempts "notices of any telephone company, telegraph company, railroad, bridges, ferries, or other transportation company necessary in the discretion of the Commissioner . . . for the safety of the public or for the direction of the public to such utility." Id. § 33.2-1204(6). This subsection also applies to government actors speaking about government business and ensures that the roadways are safe. Subsection (12) also applies only to government speech by exempting "historical markers erected by duly constituted and authorized public authorities." Id. § 33.2-1204(12). Subsection (13), which exempts "highway markers and signs erected or caused to be erected by the Commissioner . . . or other authorities in accordance with law," id. § 33.2-1204(13), clearly applies only to government speech. Finally, subsection (15) authorizes the Commissioner to approve "signs erected by Red Cross authorities relating to Red Cross Emergency Stations." Id. § 33.2-1204(15). Both the Commonwealth and the Red Cross are governmental bodies protected by the government speech doctrine. See Doe v. Am. Nat'l Red Cross, 837 F. Supp. 121, 122 (E.D.N.C. 1992) ("The Red Cross is a federal instrumentality." (citing Dep't of Emp't v. United States, 385 U.S. 355, 358-60 (1966))). Because all five of these exceptions address government speech, none is a content-based restriction of private speech.[8] As such, they are beyond the scope of BTA's First Amendment claim.

---

[8] There is little doubt that these five exceptions "draw[] distinctions based on the message a speaker conveys," Reed, 135 S. Ct. at 2227, and thus in some sense are "content based." But so too are statutes that prohibit other forms of speech not subject to the First Amendment, such as

The concurring opinion in <u>Reed</u> supports this conclusion. That opinion—authored by Justice Alito and joined by Justices Kennedy and Sotomayor, all of whom also joined the six-Justice majority—made clear that "government entities may also erect their own signs consistent with the principles that allow governmental speech" and that governments "may put up all manner of signs to promote safety, as well as directional signs and signs pointing out historic sites and scenic spots." <u>Reed</u>, 135 S. Ct. at 2233 (Alito, J., concurring). That is precisely what the Commonwealth has done here. Subsections (5), (6), and (15) promote public safety; subsection (13) allows for directional signs; and subsection (12) approves historical markers. The First Amendment simply has nothing to say about the government regulating its own speech in this way.

Once the exceptions addressing government speech are put to the side, all that remains is subsection (19), which exempts

> signs containing advertisements or notices that have been authorized by a county and that are securely affixed to a public transit passenger shelter that is owned by that county, provided that no advertisement shall be placed within the right-of-way of the Interstate System, National Highway System, or federal-aid primary system of highways in violation of federal law.

Va. Code Ann. § 33.2-1204(19). Whether such an advertisement qualifies as government speech is an interesting question, but it is ultimately of no moment: Subsection (19) does not facially discriminate based on content at all. Instead, by exempting signs that are "securely affixed to a public transit passenger shelter," it is a regulation of the place or manner of speech, not of its content.[9] In sum, the strict scrutiny analysis required by <u>Reed</u> does not apply to the current version of the statutes BTA has challenged.

---

obscenity or fraudulent commercial speech. Because government speech is outside the ambit of the Amendment, that the Exceptions Statute distinguishes between different types of government speech has no constitutional consequences.

[9] That subsection (19) applies to signs "authorized by a county" does not affect whether that subsection is content based because that authorization, at least on its face, does not "depend . . . on the communicative content of the sign." <u>Reed</u>, 135 S. Ct. at 2227. Although one can imagine

Under black-letter law, the standard applicable to content-neutral regulations of speech on government property (such as land "within the limits of the highway") depends on the nature of that property. Lytle v. Brewer, 77 F. Supp. 2d 730, 735-36 (E.D. Va. 1999) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983)). "Traditional" public forums, such as public parks and sidewalks, receive substantial protection; "[c]ontent-neutral restrictions of time, place and manner must be narrowly tailored to serve a significant governmental interest and must leave open ample alternative avenues of communication." Shopco Distrib. Co. v. Commanding Gen. of Marine Corps Base, 885 F.2d 167, 171 (4th Cir. 1989).[10] Conversely, in "nonpublic" forums—that is, government property that has "not, as a matter of tradition or designation, been used for purposes of assembly and communication," NAACP v. City of Philadelphia, 834 F.3d 435, 441 (3d Cir. 2016)—the government may impose time, place, and manner restrictions on speech, or otherwise reserve the forum for its own speech, as long as "the regulation on speech is reasonable and not an effort to suppress expression." Shopco, 885 F.2d at 171-72 (quoting Perry, 460 U.S. at 46).

The question of how to characterize areas "within the limits of any highway" for purposes of First Amendment forum analysis is not a simple one. Unlike the public sidewalk, an area "within the limits of [a] highway" is not "traditionally open to expressive activity," United States v. Kokinda, 497 U.S. 720, 729 (1990), and does not have "as 'a principle purpose . . . the free exchange of ideas,'" Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679

---

a claim alleging that the manner in which subsection (19) approvals are granted improperly discriminates based on content, no such claim is before the Court here.

[10] "Designated" or "created" public forums are those that "the government 'has opened for use by the public as a place for expressive activity.'" Shopco, 885 F.2d at 171 (quoting Perry, 460 U.S. at 45-46). They receive the same protection as traditional public forums. Id.

(1992) (alteration in original) (citation omitted). As such, it may very well be that the Sign Statutes should be analyzed as a content-neutral regulation of speech in a nonpublic forum.

This question need not be resolved today: Even assuming _arguendo_ that the more speech-protective standard applies to the areas "within the limits of any highway," defendants are entitled to judgment on BTA's First Amendment claim for prospective relief.[11] Under the standard applicable to traditional public forums,

> the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citation omitted).

As explained above, the Sign Statutes as amended are content neutral. The Highway Signs Statute and subsection (19) of the Exceptions Statute in no way "restrict expression because of its message, its ideas, its subject matter, or its content," Police Dep't of the City of Chi. v. Mosley, 408 U.S. 92, 95 (1972); they address only where signs may be placed. Further, nothing in the record suggests "any 'realistic possibility that official suppression of ideas is afoot.'" Reed, 135 S. Ct. at 2237 (Kagan, J., concurring in the judgment) (quoting Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 189 (2007)).

The Sign Statutes also serve significant governmental interests. Defendants' asserted interests include "ensuring driver safety" and "preserving aesthetic considerations on the highways." Comm'r's SJ Opp'n 7. These interests are undoubtedly significant. "[C]ommon

---

[11] Defendants have sharply opposed plaintiff's motion but have not formally moved for summary judgment. Nonetheless, the Court finds that there are no genuine issues of material fact weighing on this question and that defendants are entitled to judgment as a matter of law. In the interests of judicial economy, the Court will grant judgment for defendants without requiring unnecessary briefing from the parties.

sense and the holdings of prior cases have been found sufficient to establish . . . that the government has a significant interest in public safety." Reynolds v. Middleton, 779 F.3d 222, 227 (4th Cir. 2015); see Ross v. Early, 746 F.3d 546, 555 (4th Cir. 2014) (recognizing that municipalities have a significant interest in maintaining the "safety, order, and accessibility" of roadways and sidewalks (citation omitted)). Furthermore, "under relevant Supreme Court and Fourth Circuit precedent, a community's interest in preserving its aesthetic character is indeed a 'substantial interest.'" Am. Legion Post 7 v. City of Durham, 239 F.3d 601, 609 (4th Cir. 2001). Defendants' interests are thus well supported by precedent.

The Sign Statutes are also narrowly tailored to serve the interests defendants identify. "Narrow tailoring" in this context does not require that a regulation "be the least restrictive or least intrusive means" of serving the asserted interest. Ward, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Id. at 799 (alteration in original) (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). Here, the Sign Statutes operate to keep the highways free of visual clutter, distracting images, and physical hazards,[12] and they do so more effectively than plausible alternatives.

Finally, BTA has ample alternative communicative channels. "[T]o satisfy this standard, the available alternatives need not 'be the speaker's first or best choice,'" but there must be available "avenues for the more general dissemination of a message." Ross, 746 F.3d at 559 (internal quotation marks and citations omitted). The Sign Statutes govern only BTA's ability to post signs on government-owned land "within the limits of" a highway. They do not restrict BTA's

---

[12] For example, the record includes over 75 images of BTA signs placed within the limits of the highway. See Cty. Defs.' SJ Opp'n Ex. H [Dkt. Nos. 64-8 to -9]; Cty. Defs.' SJ Opp'n Ex. I [Dkt. No. 64-10]. Many of the signs are placed immediately on the curb; some even extend into the roadway itself. Several of the signs are not securely fastened to the curb or the ground.

ability to post advertisements on private land or in various forms of media. BTA may also seek a permit to display advertisements "visible from" the highway under other provisions of Article 1, see, e.g., Va. Code Ann. §§ 33.2-1205, -1208, and could apply to display signs "securely affixed to a public transit passenger shelter," id. § 33.2-1204(19). BTA may prefer to post its signs within the limits of highways, but the Constitution does not guarantee BTA its method of choice; all that is required is that BTA be able to reach its audience through reasonable means.

Because plaintiff cannot prevail on its First Amendment claim even assuming that highways are traditional public forums, defendants are entitled to judgment as a matter of law on BTA's request for prospective relief.

2. Damages

Count II of the Amended Complaint seeks damages, as well as attorney's fees and costs, under 42 U.S.C. §§ 1983 and 1988. Although it is clear that BTA is not entitled to any damages stemming from enforcement of the Highway Signs Statute after the April 2018 amendment to the Exceptions Statute, whether BTA may recover damages with respect to pre-amendment enforcement remains to be addressed.

Once again, the first issue is what level of scrutiny to apply. As discussed above, BTA argues that before the recent amendment, all of the provisions of the Exceptions Statute applied to the Highway Signs Statute. Because some of those exceptions were content-based restrictions on private speech, see, e.g., Va. Code Ann. § 33.2-1204(2), (3), (9), (16)-(18), BTA argues that the Court must apply strict scrutiny under Reed. Defendants respond that before April 2018, only one of the Exceptions Statute's provisions—subsection (19)—applied to the Highway Signs Statute.

BTA emphasizes that the prefatory portion of the pre-amendment Exceptions Statute provided that the categories of signs listed "are excepted from all the provisions of this article except those enumerated in" a few provisions not including the Highway Signs Statute. See Va.

Code Ann. § 1204 (emphasis added). Because the Highway Signs Statute is included in Article 1, BTA argues that the effect of the pre-amendment Exceptions Statute was to carve out categories of signs from the Highway Signs Statute's general prohibition. But BTA has never offered a satisfactory explanation for why, if all of the exceptions applied to the Highway Signs Statute, one (and only one) of the exceptions began with the phrase "notwithstanding the provisions of § 33.2-1224." See id. § 33.2-1204(19) (2017). BTA essentially asks the Court to ignore that portion of subsection (19), an approach that would defy traditional principles of statutory construction. See Lynchburg Div. of Soc. Servs. v. Cook, 666 S.E.2d 361, 370 (Va. 2008) ("[E]very part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." (alteration in original) (quoting Hubbard v. Henrico Ltd. P'ship, 497 S.E.2d 335, 338 (Va. 1998))). Nor did BTA include a single allegation or cite any fact indicating that any of the other exceptions were ever actually applied to allow signs to be posted within the limits of the highway, even after defendants made clear that they disputed whether the exceptions applied.

Defendants' alternative construction is not without problems of its own. Defendants first look to the policy and definitions provision of Article 1, arguing that Article 1 generally is oriented toward regulating "the erection and maintenance of outdoor advertising in areas adjacent to" highways. Va. Code Ann. § 33.2-1200(A) (emphasis added). The way defendants construe the pre-amended Exceptions Statute, the prefatory provision's statement exempting categories "from all the provisions of this article" means those provisions that regulate signs "adjacent to" highways. This construction would exclude the Highway Signs Statute's more specific regulation of areas "within the limits of" highways. To be sure, defendants' construction is not the most natural reading of the prefatory phrase, but it makes sense of subsection (19)'s language with respect to the Highway Signs Statute. Further, it accords with the structure of

Article 1 as a whole. Cf. Mellouli v. Lynch, 135 S. Ct. 1980, 1989 (2015) ("Statutes should be interpreted 'as a symmetrical and coherent regulatory scheme.'" (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000))). In plaintiff's view, the Exceptions Statute would apply to every provision in Article 1 unless specifically stated otherwise, but this would produce the odd result of applying the Exceptions Statute to the provision designating the Commissioner as the official responsible for administering the scheme, see id. § 33.2-1201, and provisions governing activity wholly unrelated to signs, see, e.g., id. § 33.2-1222 (tree-trimming). Thus, the statutory context makes clear that the prefatory phrase is not as plain as it may appear at first sight. Cf. King v. Burwell, 135 S. Ct. 2480, 2489 (2015).

The Court concludes that the pre-amendment statutory scheme is ambiguous as to whether the other exceptions in the Exceptions Statute applied to the Highway Signs Statute. Faced with a statutory scheme "susceptible of more than one construction" after the application of traditional tools of statutory application, the Court will resolve this issue through the canon of constitutional avoidance. Clark v. Martinez, 543 U.S. 371, 385 (2005). Under this well-established doctrine, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary" to the legislature's intent. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988).

Construing the pre-amendment Exceptions Statute to have applied to the Highway Signs Statute would raise substantial constitutional concerns under the framework expounded in Reed because many of the exceptions appear to discriminate on the basis of the content of private speech. See, e.g., Va. Code Ann. § 33.2-1204(2) (2017) (exempting signs "on any farm by the owner or lessee . . . relating solely to farm produce, merchandise, services, or entertainment"). In light of these concerns, the Court construes the statutory scheme as defendants suggest and finds

that before April 2018, only subsection (19) of the Exceptions Statute applied to the Highway

Signs Statute. In other words, only signs that were "authorized by a county and . . . securely

affixed to a public transit passenger shelter," id. § 33.2-1204(19), were entitled to be placed

"within the limits of any highway," id. § 33.2-1224. This construction is not inconsistent with the

statutory text and context and is not plainly contrary to the legislature's intent. To the contrary,

this interpretation serves the legislature's apparent objective of treating the area "within the

limits of" highways with special precaution. See, e.g., id. § 33.2-1224 (providing that the

Highway Signs Statute's prohibition "shall not apply to signs or outdoor advertising regulated

under other provisions of this chapter").

This ruling is fatal to plaintiff's claim for damages. As fully explained above,

subsection (19) and the Highway Signs Statute together form a content-neutral regulation of

speech on government property. Even assuming that areas within the limits of the highway are

traditional public forums, defendants are entitled to judgment on BTA's claim. Accordingly,

BTA's claim for damages stemming from its First Amendment claim will be dismissed.

**F. Prior Restraint**

BTA next claims that the Highway Signs Statute, which authorizes the Commissioner to

seek an injunction against "recurring violator[s]" of the provision, Va. Code Ann. § 33.2-1224,

"is an unconstitutional prior restraint against speech." Am. Compl. [Dkt. No. 46] 12. A prior

restraint is an administrative or judicial order forbidding protected speech issued before such

speech is to occur. Alexander v. United States, 509 U.S. 544, 550 (1993). Because prior

restraints "are the most serious and the least tolerable infringement on First Amendment rights,"

Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976), "[a]ny system of prior restraints comes to

this Court bearing a heavy presumption against its constitutional validity," and the government

"carries a heavy burden of showing justification for the imposition of such a restraint." <u>N.Y.</u> <u>Times Co. v. United States</u>, 403 U.S. 713, 714 (1971) (per curiam) (citations omitted).

The County Defendants argue that BTA's prior restraint claim is not ripe because no injunction has been issued and because the state litigation has been stayed pending resolution of this action. Ripeness "concerns the appropriate timing of judicial intervention," <u>Cooksey v.</u> <u>Futrell</u>, 721 F.3d 226, 240 (4th Cir. 2013) (citation omitted), and "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," <u>Reno v. Catholic Soc. Servs., Inc.</u>, 509 U.S. 43, 57 n.18 (1993). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967).

The County Defendants are correct that the prior restraint issue is not ripe. In <u>Woodall v.</u> <u>Reno</u>, 47 F.3d 656 (4th Cir. 1995), the plaintiffs challenged a federal statute giving the federal and state attorneys general authority to seek injunctive relief against persons violating the Freedom of Access to Clinic Entrances Act. <u>Id.</u> at 657-58. As the Fourth Circuit observed, the plaintiffs did not claim that they had been enjoined or that an injunction was being sought against them. <u>Id.</u> at 658. The Fourth Circuit declined to "assume that a court would issue an injunction in violation of the well-established prior restraint doctrine" and instead dismissed that aspect of the plaintiffs' complaint "until a more concrete controversy ar[ose]." <u>Id.</u>

To be sure, in <u>Woodall</u> no injunction had been sought against the plaintiffs, whereas the Board here has sought an injunction in state court. But no injunction has issued, and the state court has stayed that proceeding. At present, it is uncertain whether the state court would grant an injunction or what form that injunction would take. Without the benefit of a more crystallized factual setting, the Court is without jurisdiction to rule on the facial validity of the injunction provision. Accordingly, the prior restraint claim will be dismissed without prejudice.

### G. Vagueness

BTA also argues that the Highway Signs Statute is unconstitutionally vague. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). A statute is too vague to be enforced consistent with due process principles if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." Fox, 567 U.S. at 253 (quoting United States v. Williams, 553 U.S. 285, 304 (2008)). These concerns are of even greater dimension in the First Amendment context: "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." Id. at 253-54; see Reno v. ACLU, 521 U.S. 844, 871-72 (1997) (observing that vagueness in content-based speech regulations "raises special First Amendment concerns because of [the] obvious chilling effect on free speech").

BTA argues that the Highway Signs Statute is unconstitutionally vague because it does not define "within the limits of the highway." BTA's SJ Br. 11. It also objects that enforcement is "left to the discretion of the enforcers." Id. As a result, "neither BTA nor anyone else reviewing this statute could be certain what conduct is proscribed by the statute, and the enforcement methods are left entirely to the discretion of the Commissioner . . . or the Board." Id.

The provision in question is not unconstitutionally vague. Although "we can never expect mathematical certainty from our language," all that the Due Process Clause requires is that reasonably intelligent people be able to understand "what the ordinance as a whole prohibits." Hill v. Colorado, 530 U.S. 703, 733 (2000) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)). "Within the limits of the highway" may leave room for debate about precisely how close a sign may be to the edge of the roadway, but a provision is not rendered unconstitutional

simply because the legislature used descriptive rather than mathematical terms. See Grayned, 408 U.S. at 107-14 (rejecting a void for vagueness challenge against an ordinance using the phrase "adjacent to" a school building). The phrase upheld in Grayned is broader and has a greater potential for ambiguity than the phrase at issue here.

The Court finds that an "ordinary person exercising ordinary common sense can sufficiently understand" the phrase "within the limits of any highway," particularly given the context of the Sign Statutes and the harms those statutes are designed to mitigate. See Wag More Dogs, Ltd. Liability Corp. v. Cozart, 680 F.3d 359, 371-72 (4th Cir. 2012) (citation omitted). Any doubt about the statute's scope is not of constitutional magnitude and does not raise genuine concerns sounding either in lack of fair notice or in the proper separation of powers.

Although no defendant has formally moved for summary judgment as to BTA's vagueness claim, the Commissioner in its opposition requested that the Court grant judgment in its favor on that claim, and all defendants moved to dismiss the claim in an earlier round of briefing. The Court will not require the empty formality of having defendants file new motions; instead, judgment for defendants on plaintiff's void-for-vagueness claim is appropriate.

## H. Selective Enforcement

BTA argues that the Sign Statutes have been selectively enforced against it. Am. Compl. [Dkt. No. 46] ¶ 55. In support, it alleges that it "has been cited repeatedly . . . while other signs have remained without penalty." Id. at ¶¶ 35, 55. It adds that VDOT began enforcing the statute against BTA "because of citizen complaints targeted towards BTA," id. ¶ 21; that "other realtors and competitors of BTA were either not fined or fined to a lesser degree," id. ¶ 33;[13] and that the

---

[13] BTA alleges that from March to September 2016, the DCC collected 14,573 signs, "of which an estimated 1 percent or fewer belonged to BTA," and from May to October 2016, the DCC issued 348 fines, 73 of which (or approximately 21%) went to BTA. Am. Compl. [Dkt. No. 46] ¶¶ 36-37. That these figures relate to different time periods makes it difficult to assess how they

DCC "trained its agents to target BTA when enforcing" the statute by using BTA signs as an example, id. ¶ 35. Finally, BTA also alleges that a Board supervisor called a BTA officer "and personally demanded that BTA comply with the Highway Signs Statute." Id. ¶ 30. The County Defendants have moved to dismiss BTA's selective enforcement claim, arguing that plaintiff has not alleged sufficient facts indicating any County policy, custom, or practice of selective enforcement and that plaintiff has failed to allege a plausible case of intentional discrimination.

The Equal Protection Clause protects "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (citation omitted). "[W]here the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," she may bring a "class of one" claim to challenge the government's selective enforcement. Id. Importantly, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," provided "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Bordenkircher v. Hayes, 434 U.S. 357, 364-65 (1978) (alteration in original) (citation omitted).

Like all claims under the Equal Protection Clause, a selective enforcement claim "requires a plaintiff to demonstrate that the government's enforcement process 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Cent. Radio Co. v. City of Norfolk, 811 F.3d 625, 634-35 (4th Cir. 2016) (citation omitted); see also Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 825 (4th Cir. 1995) (requiring "a showing of clear and

---

relate to each other; nevertheless, the Court will assume BTA received fines at a rate greater than the proportion of signs for which it was responsible.

intentional discrimination" to support a class-of-one claim). The discriminatory intent[14] required to sustain an equal protection challenge "implies more than intent as volition or intent as awareness of consequences"; rather, "[i]t implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Sylvia Dev. Corp., 48 F.3d at 819 n.2 (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)). Several factors must be considered in determining whether a governmental actor had the requisite intent, including (i) "evidence of a 'consistent pattern' of actions by the decisionmaking body disparately impacting members of a particular class of persons"; (ii) the "historical background of the decision"; (iii) "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures"; and (iv) "contemporary statements by decisionmakers on the record." Id. at 819.

The Court need not decide the discriminatory effect issue[15] because BTA has failed to plead sufficient facts showing that the County Defendants "w[ere] motivated by a discriminatory

---

[14] To say that a plaintiff must show discriminatory intent is not to say she must show that the government's selection was "invidious," malicious, or "in bad faith," see, e.g., LeClair v. Saunders, 627 F.2d 606, 609 (2d Cir. 1980) (citation omitted). All that is required in this circuit is a showing that plaintiff "was irrationally or arbitrarily treated differently from similarly situated parties." Tri Cty. Paving, Inc. v. Ashe County, 281 F.3d 430, 440 (4th Cir. 2002).

[15] BTA's arguments on discriminatory effect suffer from a faulty comparison. BTA alleges that the County Defendants have fined BTA when other entities who posted nearby signs were not fined and that the proportion of times BTA was fined as compared to other violators exceeds the proportion of seized signs for which it was responsible. BTA treats as the relevant comparator anyone who has posted a sign within the limits of a highway. What that analysis ignores is that BTA regularly posts a significant number of signs. The Equal Protection Clause does not "require things which are different in fact or opinion to be treated in law as though they were the same." Tigner v. Texas, 310 U.S. 141, 147 (1940). Plaintiff must show discriminatory treatment by reference to others "who are in all relevant respects alike." Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty., 862 F.3d 433, 444 (4th Cir. 2017) (emphasis added) (quoting Nordinger v. Hahn, 505 U.S. 1, 10 (1992)), cert. denied, 138 S. Ct. 1593 (2018). Accordingly, to survive defendants' motion to dismiss this claim, BTA must allege not that it was treated differently

intent," Cent. Radio, 811 F.3d at 635. None of the recognized factors indicating discriminatory intent is present here. BTA alleges a few instances of differential treatment, but nothing approaching a "consistent pattern" of overzealous or selective enforcement against BTA. No comments or departures from procedure suggest that the County Defendants consciously decided to target BTA. In short, nothing in BTA's Amended Complaint plausibly supports the conclusion that BTA "was irrationally or arbitrarily treated differently from similarly situated parties," Tri Cty. Paving, Inc. v. Ashe County, 281 F.3d 430, 440 (4th Cir. 2002).

None of BTA's arguments to the contrary is availing. BTA emphasizes that the County Defendants included an image of a BTA sign as an example in training materials and urges the Court to infer that the County Defendants were encouraging enforcers to target BTA. That the County Defendants used a BTA sign as an example is at best "consistent with" a conscious scheme, Iqbal, 556 U.S. at 681, and is far more likely a result of BTA's posting a significant number of signs in a geographically concentrated area. Likewise, BTA's claim that VDOT began enforcing the statute against it due to citizen complaints does not help its argument. Awareness on the part of VDOT or the Commissioner that BTA may have been violating the statute is a far cry from an intentional policy or practice on the County Defendants' part of arbitrarily enforcing the statute against BTA. Finally, BTA alleges that "shortly before the . . . County started issuing penalties, it was contacted by Supervisor Patrick Herrity who personally insisted that BTA comply with the statutes at issue." Pl.'s Consolidated Opp'n to the Defs.' Mots. to Dismiss [Dkt. No. 25] 20. This argument is of no help to BTA. That the County Defendants were aware that BTA was violating the statute does not speak to whether the County Defendants intended to target BTA and leave others unchecked. BTA has not "nudged" its selective enforcement claim

---

from anyone who posted a sign next to a highway, but rather that it was treated differently from others who posted signs with similar frequency and in similar numbers.

"across the line from conceivable to plausible," <u>Twombly</u>, 550 U.S. at 570, and as such that claim will be dismissed.

**I.  <u>Remaining Claims</u>**

The Amended Complaint also included claims that the Sign Statutes violate the Virginia Constitution, <u>see</u> Va. Const. art. I, § 12 ("[T]he General Assembly shall not pass any law abridging the freedom of speech . . . ."), and that the County Defendants' actions in enforcing the Sign Statutes "violate BTA's property rights without due process of law as required by the Fourteenth Amendment," Am. Comp. [Dkt. No. 46] ¶¶ 45-46, 51. BTA has not pursued these claims further. Because BTA has failed to allege facts indicating that the County Defendants' enforcement of the Highway Signs Statute plausibly violated BTA's due process rights, its Fourteenth Amendment claim will be dismissed. And because there are no remaining federal law issues in the case, the Court will decline to exercise supplemental jurisdiction over BTA's state constitutional claims, which are better addressed in state court. <u>See</u> <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988).

III. CONCLUSION

For the reasons stated above, the County Defendants' and the Commissioner's motions to dismiss will be granted; BTA's motion for partial summary judgment and for injunctive relief will be denied; and judgment for defendants will be entered by an order to be issued with this Memorandum Opinion.

Entered this 16 day of November, 2018.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia